## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

07 CV 11156

ALAN STEVENS, On Behalf of Himself and
All Others Similarly Situated,

Civil Action No.

Plaintiff,

v.

CITIGROUP, INC., CITIBANK, N.A.,
CHARLES PRINCE, C. MICHAEL
ARMSTRONG, ALAIN J.P. BELDA,
GEORGE DAVID, KENNETH T. DERR,
JOHN M. DEUTCH, PETER JOHNSON,
ROBERTO HERNANDEZ RAMIREZ,
ANDREW N. LIVERIS, ANNE MULCAHY,
RICHARD D. PARSONS, JUDITH RODIN,
ROBERT E. RUBIN, ROBERT L. RYAN,
FRANKLIN A. THOMAS, THE PLANS
ADMINISTRATION COMMITTEE OF
CITIGROUP, INC., THE INVESTMENT
COMMITTEE and JOHN DOES 1-30,

Defendants.

**CLASS ACTION COMPLAINT
FOR VIOLATIONS OF THE
EMPLOYER RETIREMENT
INCOME SECURITY ACT OF 1974**



RECEIVED
DEC 1 1 2007
U.S.D.C. S.D. N.Y.
CASHIERS

Plaintiff, participant in the Citigroup 401(k) Plan ("401(k) Plan") during the proposed

Class Period, on behalf of the 401(k) Plan and the Citibuilder 401(k) Plan For Puerto Rico

("Citibuilder Plan")[1], himself, and all others similarly situated, alleges as follows:

### NATURE OF THE ACTION

1.     Plaintiff brings this suit as a civil enforcement action under the Employee

Retirement Income Security Act of 1974 ("ERISA") §§ 405, 409, 502(a)(2), (3), 29 U.S.C. §§

1105, 1109 and 1132(a)(2), (3), for relief on behalf of the Plans. The Plans are retirement plans

operated and established by Citigroup Inc. ("Citigroup" or the "Company") as a benefit for its

employees to permit tax-advantaged savings for retirement and other long-term goals. Citigroup

---

[1]     The 401(k) Plan and Citibuilder Plan are collectively referred to herein as the "Plans."

common stock is one of the investments offered in the 401(k) Plan and the Citibuilder Plan. According to the Company's Form 11-K filed with the U.S. Securities and Exchange Commission ("SEC") on June 28, 2007 for the 401(k) Plan (the "401(k) 2006 11-K"), in excess of $4.1 billion of the 401(k) Plan's $12.9 billion or more in assets were invested in Citigroup stock. Likewise, according to the Company's Form 11-K filed with the SEC on June 28, 2007, for the Citibuilder Plan (the "Citibuilder 2006 11-K"), approximately $7.4 million of the Citibuilder Plan's $23 million or more in assets were invested in Citigroup stock. Indeed, the Plans were heavily invested in Citigroup stock at all times relevant to this action, as discussed herein.

2.      Plaintiff Alan Stevens is a current participant in the 401(k) Plan during the class period of January 1, 2007 through the present (the "Class Period"). During the Class Period, his retirement portfolio included Citigroup stock.

3.      Plaintiff alleges that Defendants, as fiduciaries of the Plans, breached their duties to him and to other participants and beneficiaries of the Plans during the Class Period in violation of ERISA, particularly with regard to the Plans' holdings of Citigroup stock.

4.      Citigroup is the sponsor of the 401(k) Plan. Citibank, N.A. ("Citibank") is the sponsor of the Citibuilder Plan. The Plans Administration Committee of Citigroup Inc. is the Plans' administrator. Citibank is the 401(k) Plan's trustee. Banco Popular de Puerto Rico is the trustee of the Citibuilder Plan.

5.      Since the Plans' holdings in Citigroup stock comprised a significant percentage of the overall value of the assets held by the Plans, the long-term retirement savings of the Plans' participants were dependent to a substantial degree both on the performance of Citigroup stock, as well as the related need for prudent fiduciary decisions by Defendants concerning such a

2

large, ongoing investment of assets of the Plans. This action alleges that the fiduciaries of the Plans breached their fiduciary duties to the Plans and their participants under ERISA, by, <u>inter alia</u>, selecting and maintaining Company stock as an investment alternative for participant contributions and Company matching contributions, when it was no longer a suitable or prudent investment option for the Plans.

6.      The breaches were ongoing and arose out of Defendants' continuing duties to review, evaluate, and monitor the suitability of the Plans' investment in Citigroup stock, and to provide accurate material information to enable participants to make informed investment decisions concerning their holdings invested in Company stock.

7.      The basic prudence allegations arise from the fact that Defendants knew, or should have known, that Citigroup was engaging in risky and unsound business practices in connection with its risky investment in conduits and Structured Investment Vehicles ("SIVs"), including its exposure to the subprime credit market, which have rendered Citigroup stock an imprudent, inappropriate and extraordinarily risky investment for the retirement savings of the Plans' participants.

8.      As a result of Defendants' fiduciary breaches, as hereinafter enumerated and described, the Plans have suffered substantial damages, including the erosion of hundreds of millions of dollars of retirement savings and anticipated retirement income for the Plans' participants. Indeed, the Plans' participants have seen their retirement savings accounts devastated as Company stock plummeted from a high of approximately $55 per share near the beginning of the Class Period to a price of approximately $33 per share at the end of the Class Period. Under ERISA, the breaching fiduciaries are obligated to restore to the Plans the losses resulting from these fiduciary breaches.

3

9.     Because Plaintiff's claims apply to the participants and beneficiaries as a whole, and because ERISA authorizes participants such as Plaintiff to sue for Plan-wide relief for breach of fiduciary duty, Plaintiff brings this case as a class action on behalf of all participants and beneficiaries of the Plans during the Class Period. Plaintiff also brings this action as participants seeking Plan-wide relief for breach of fiduciary duty on behalf of the Plans.

10.     Because much of the information and documents on which Plaintiff's claims are based are solely in Defendants' possession, certain of Plaintiff's allegations are by necessity upon information and belief. At such time as Plaintiff has had the opportunity to conduct additional discovery, Plaintiff will, to the extent necessary and appropriate, further amend the Complaint, or, if required, seek leave to amend to add such other additional facts as are discovered that further support each of the claims below.

## JURISDICTION AND VENUE

11.     This Court has subject matter jurisdiction over this action pursuant to ERISA § 502(e)(1), 29 U.S.C. § 1132(e)(1).

12.     This Court has personal jurisdiction over Defendants under ERISA § 502(e)(2), 29 U.S.C. § 1132(e)(2), as one or more of the Defendants may be found in this District. The Court also has personal jurisdiction over Defendants because the Company maintains its executive offices in this District, and the trust account for the 401(k) Plan is maintained within this District. Defendants systematically and continuously have done and continue to do business in this District, and this case arises out of Defendants' acts within this District.

13.     Venue is proper under ERISA § 502(e)(2), 29 U.S.C. § 1132(e)(2), because the Plans were either administered in this District, some or all of the actionable conduct for which relief is sought occurred in this District, and/or one or more of the Defendants reside or may be found in this District.

4

## THE PARTIES

### Plaintiff

14.     Plaintiff Alan Stevens is a resident of Hauppauge, New York. He is a current participant in the 401(k) Plan, within the meaning of ERISA § 3(7) and 502(a), 29 U.S.C. § 1102(7) and §1132(a), and was a participant in the 401(k) Plan throughout the Class Period. During the Class Period, Plaintiff Stevens held Citigroup stock in his individual 401(k) Plan account.

### Corporate Defendants

15.     Defendant Citigroup is a Delaware corporation with its principal place of business located at 399 Park Avenue, New York, NY 10043. Citigroup, a multibank holding company, provides various financial services to customers in the United States and internationally. The Company's Global Consumer segment offers banking, lending, insurance, and investment services. Its Markets and Banking segment provides various investment and commercial banking services and products, which comprise investment banking and advisory services, debt and equity trading, institutional brokerage, foreign exchange, structured products, derivatives, and lending. It also offers cash management and trade finance for corporations and financial institutions; custody and fund services to insurance companies and pension funds; clearing services to intermediaries; and depository and agency/trust services to multinational corporations and governments. The Company's Global Wealth Management segment provides investment advice, financial planning, and brokerage services to affluent individuals, companies, and non-profits. The Company's Alternative Investments segment manages products across five asset classes, such as private equity, hedge funds, real estate, structured products, and managed futures. Citigroup was founded in 1812 and is based in New York, New York.

16.     Citibank is a corporation organized and existing under the laws of the state of
New York, with its principal place of business at 111 Wall Street, New York, New York.
Citibank delivers a wide array of banking, lending and investment services to individual
consumers, as well as to small businesses with up to $10 million in annual sales. Citigroup is the
parent holding company of Citibank.

17.     Upon information and belief, Citigroup at all times acted through its officers,
directors and employees, including the Chief Executive Officer ("CEO"). Citigroup had, at all
times relevant herein, effective control over the activities of its officers and employees, including
their Plan-related activities. Citigroup exercises ultimate discretionary decisional authority with
respect to all aspects of the administration of the Plans, management and disposition of the
Plans' assets, and appointment and removal of fiduciaries through its management employees,
Citigroup's Board of Directors (the "Board"), Administration Committee and/or Investment
Committee (terms are defined herein).

18.     Upon information and belief, under the terms of the Plans, Citigroup was given
direct control and management over any aspect of the operation, or administration of the Plans
that was not specifically delegated to the named fiduciaries under the Plans and upon information
and belief, exercised this control. Upon information and belief, the Plans name Citigroup as the
administrator, as that term is defined in Section 3(16) of ERISA 29 U.S.C. § 1002(16). Under
ERISA, a plan administrator is inherently a fiduciary.

19.     As a matter of corporate law, Citigroup is imputed with the knowledge that its
Board and management employees had of the misconduct alleged herein, even if not
communicated to Citigroup.

20.     Upon information and belief, Citigroup, together with its Board, exercised responsibility for communicating with participants regarding the Plans, and providing participants with information and materials required by ERISA.  In this regard Citigroup, together with the Board, drafted and disseminated various documents and materials related to the Plans, including but not limited to, a Summary Plan Description ("SPD") and the documents incorporated into the SPD.  Based on the allegations contained herein, Citigroup is a fiduciary with respect to the Plans because it exercised discretionary authority or discretionary responsibility in the administration of the Plans, exercised discretionary authority or control with respect to the management of the Plans' assets, and exercised discretionary authority and control with respect to the appointment of other Plan fiduciaries.

21.     ***The Board.***  Upon information and belief, the business and affairs of the Company are managed under the direction of the Board, including with respect to the Company's role as a fiduciary of the Plans.  One of the many roles or functions of the Board is the power to appoint the members of the Investment Committee and Administration Committee (as defined below).  Upon information and belief, the Board likewise exercised management or control over the Investment Committee and Administration Committee.  Based on the above, the Board is a fiduciary with respect to the Plans because it exercised discretionary authority or discretionary responsibility in the administration of the Plans, exercised discretionary authority or control with respect to the management of the Plans' assets, and exercised discretionary authority and control with respect to the appointment of other Plans' fiduciaries.

22.     ***The Investment Committee.***  Upon information and belief, the Plans assigned fiduciary responsibilities to the Investment Committee.  Upon information and belief, the Investment Committee has the authority to designate investment funds for the investment of

7

accounts and to establish rules and procedures with respect to investment funds. Upon

information and belief, members of the Investment Committee are appointed by the Board.

Upon information and belief, the Investment Committee is a "Named Fiduciary" under Plans and

under § 402(a) of ERISA, 29 U.S.C. § 1102(a). Upon information and belief, among the powers

afforded to the Investment Committee is the ability to direct the investment of the Plans' assets,

including buying or selling Company stock. Upon information and belief, the Investment

Committee has the power to add or remove certain investment options under the Plans. Upon

information and belief, the Investment Committee also has the power to appoint an investment

manager for the Plans. Based on the above, the Investment Committee is a fiduciary with respect

to the Plans because it exercised discretionary authority or discretionary responsibility in the

administration of the Plans, exercised discretionary authority or control with respect to the

management of the Plans' assets, and exercised discretionary authority and control with respect

to the appointment of other fiduciaries of the Plans.

     23.    ***The Plans Administration Committee of Citigroup, Inc.***  The Plans assigned

fiduciary responsibilities to the Plans Administration Committee of Citigroup, Inc. (the

"Administration Committee"). The Administration Committee is a "Named Fiduciary" under the

Plans and under § 402(a) of ERISA, 29 U.S.C. § 1102(a). According to the SPD for the 401(k)

Plan, the Administration Committee is the "Plan Administrator and is responsible for the

operation and administration of the Plan." The Administration Committee has such powers as

may be necessary to carry out the provisions of the Plans, including the power and discretion to

determine all benefits and resolve all questions pertaining to the administration, interpretation,

and application of Plan provisions. Upon information and belief, members of the Administration

Committee are appointed by the Board.

**Individual Defendants**

24.    Defendant Charles Prince ("Prince") served as Citigroup's Chief Executive Officer and Chairman of the Board at times during the Class Period. Prince was a fiduciary in that, in his high-level capacity and role within the Company, he exercised discretionary authority with respect to administration, control and/or management of the Plans.

25.    Defendant C. Michael Armstrong ("Armstrong") was a member of the Board during the Class Period. During the Class Period, Armstrong served as the Chair of the Audit and Risk Management Committee and as a member of the Executive Committee and the Nomination and Governance Committee.

26.    Defendant Alain J.P. Belda ("Belda") was a member of the Board during the Class Period. During the Class Period, Belda served as Chair of the Nomination and Corporate Governance Committee and as a member of the Executive Committee and the Personnel and Compensation Committee.

27.    Defendant George David ("David") was a member of the Board during the Class Period. During the Class Period, David served as a member of the Audit and Risk Management Committee and the Nomination and Corporate Governance Committee.

28.    Defendant Kenneth T. Derr ("Derr") was a member of the Board during the Class Period. During the Class Period, Derr was a member of the Personnel and Compensation Committee and the Nomination and Governance Committee.

29.    Defendant John M. Deutch ("Deutch") was a member of the Board during the Class Period. During the Class Period, Deutch was a member of the Audit and Risk Management Committee and the Nomination and Governance Committee.

9

30.     Defendant Peter Johnson ("Johnson") was the Director of Corporate Benefits for Citigroup during the Class Period. During the Class Period, Johnson served on the Administration Committee.

31.     Defendant Roberto Hernandez Ramirez ("Ramirez") was a member of the Board during the Class Period. During the Class Period, Ramirez was a member of the Public Affairs Committee.

32.     Defendant Andrew N. Liveris ("Liveris") was a member of the Board during the Class Period. During the Class Period, Liveris served as a member of the Audit and Risk Management Committee.

33.     Defendant Anne Mulcahy ("Mulcahy") was a member of the Board during the Class Period. During the Class Period, Mulcahy served on the Audit and Risk Management Committee.

34.     Defendant Richard D. Parsons ("Parsons") was a member of the Board during the Class Period. During the Class Period, Parsons served as Chair of the Personnel and Compensation Committee, as a member of the Executive Committee and the Nomination and Governance Committee.

35.     Defendant Judith Rodin ("Rodin") was a member of the Board during the Class Period. During the Class Period, Rodin served as Chair of the Public Affairs Committee, and as a member of the Audit and Risk Management Committee and the Executive Committee.

36.     Defendant Robert E. Rubin ("Rubin") was Chairman of the Board during the Class Period. During the Class Period, Rubin was the Chair of the Executive Committee.

37.    Defendant Robert L. Ryan ("Ryan") was a member of the Board during the Class Period. During the Class Period, Ryan was a member of the Audit and Risk Management Committee and Public Affairs Committee.

38.    Defendant Franklin A. Thomas ("Thomas") was a member of the Board during the Class Period. During the Class Period, Thomas was a member of the Public Affairs Committee.

39.    The defendants identified in ¶¶ 24 through 38 are sometimes referred to herein as the "Individual Defendants." The Individual Defendants are fiduciaries of the Plans within the meaning of ERISA.

40.    *The Board Defendants.* Citigroup, as a corporate entity, cannot act on its own without any human counterpart. In this regard, during the Class Period, Citigroup relied and continues to rely directly on each of the Board Defendants to carry out its fiduciary responsibilities under the Plans and ERISA as specified in ¶ 21 of this Complaint and therefore each member of the Board is a fiduciary for the reason stated in ¶ 21.

41.    In addition, each member of the Board carried out the Board's role as a fiduciary with respect to the Plan as set forth in ¶ 21, engaged in the conduct and had the powers and duties alleged in ¶ 21, and was, therefore, a fiduciary for the reasons set forth in ¶ 21.

42.    The individuals who served on the Board and acted as fiduciaries with respect to the Plans during the Class Period are as follows: Defendants Prince, Armstrong, Belda, David, Derr, Deutch, Ramirez, Liveris, Mulcahy, Parsons, Rodin, Rubin, Ryan and Thomas (collectively, the "Board Defendants").

43.    *The Management Defendants*. Citigroup as a corporate entity, cannot act on its own without any human counterpart. In this regard, during the Class Period, Citigroup relied

and continues to rely directly on various high-level corporate officers and employees to carry out its fiduciary responsibilities under the Plans and ERISA.  Upon information and belief, during the Class Period, based on their high-level capacity and role within the Company relating to administration of the Plans, each Defendant listed in this paragraph carried out the Company's role as a fiduciary as specified in ¶¶ 17-20 as well as influenced, managed and controlled the Company in its role as a Plan fiduciary.  The following individuals are therefore fiduciaries for the reasons set forth in ¶¶ 17-20:  Defendant Prince (the "Management Defendants").  Citigroup and the Management Defendants listed in this paragraph shall collectively be referred to as the "Citigroup Defendants."

44.    Plaintiff does not currently know the identity of all the individual Management Defendants during the Class Period. Therefore, some of the Management Defendants are named fictitiously, as Defendants Does 1 to 10. Once their true identities are ascertained, Plaintiff will seek leave to join them under their true names.

45.    *The Investment Committee Defendants*.  Upon information and belief, during the Class Period each member of the Investment Committee carried out the Investment Committee's role as a fiduciary with respect to the Plans as set forth in ¶ 22, engaged in the conduct and had the power and duties alleged in ¶ 22 and was therefore a fiduciary for the reasons set forth in ¶ 22.

46.    Plaintiff does not currently know the identity of all the Investment Committee Defendants during the Class Period.  Therefore, the members of the Investment Committee Defendants are named fictitiously, as Defendants Does 11 to 20. Once their true identities are ascertained, Plaintiff will seek leave to join them under their true names.

47.    **The Administration Committee Defendants**.  During the Class Period each member of the Administration Committee carried out the Administration Committee's role as a fiduciary with respect to the Plans as set forth in ¶ 23, engaged in the conduct and had the power and duties alleged in ¶ 23) and was therefore a fiduciary for the reasons set forth in ¶ 23.

48.    The following individual is therefore a fiduciary for the reasons set forth in ¶ 23: Defendant Johnson (collectively, the "Administration Committee Defendants").  Plaintiff does not currently know the identity of all the Administration Committee Defendants during the Class Period.  Therefore, the members of the Administration Committee Defendants are named fictitiously, as Defendants Does 21 to 30.  Once their true identities are ascertained, Plaintiff will seek leave to join them under their true names.

49.    The Investment Committee Defendants and the Administration Committee Defendants are collectively referred to herein as the "Committee Defendants."  The Investment Committee and the Administration Committee are collectively referred to herein as the "Committee."

**NATURE OF THE PLANS**

### The 401(k) Plan

50.    The 401(k) Plan is a defined contribution 401(k) plan that commenced activities on January 1, 1987, and covers eligible employees of Citigroup and its subsidiaries.  Citigroup encourages its eligible employees to become active participants in the 401(k) Plan and saving for their financial future.  According to the SPD for the 401(k) Plan, the 401(k) Plan is a convenient way for employees to save for retirement through tax-deferred contributions from their pay.  A full-time employee of the Company is eligible to participate in the 401(k) Plan beginning with the first pay period following their date of hire.  A part-time employee of the Company is eligible

13

to participate on the January 1 or July 1 after they work at least 1,000 hours during their first 12 months with the Company or 1,000 hours in any calendar year after their date of hire.

51.     The 401(k) Plan has an automatic enrollment feature to encourage savings from the time employees begin working at Citigroup. As a full-time employee, that individual will be enrolled in the 401(k) Plan automatically 90 days from the date of hire. At that time, 3% of the employee's eligible pay will be deducted each pay period and deposited into the Citi Institutional Liquid Reserves Fund. If an employee does not want to contribute to the 401(k) Plan, they will need to opt out within 90 days of their hire date.

52.     The 401(k) Plan consists of an Employee stock Ownership Plan ("ESOP") component and a non-ESOP component. The ESOP component consists of any amount invested in the Citigroup Common stock Fund under the 401(k) Plan, provided these amounts are attributable to Company matching contributions and earnings thereon made to participant accounts for any plan year beginning on or after January 1, 2003.

53.     Upon information and belief, the portion of the 401(k) Plan that invested in the Citigroup Common stock Fund does not qualify as an ESOP under the numerous requirements set forth in both ERISA and the Internal Revenue Code. Upon information and belief, the 401(k) Plan's Summary Plan Description is silent with regard to the 401(k) Plan's purported status as an ESOP.

54.     Upon information and belief, under the terms of the 401(k) Plan, there was no requirement that any of the 401(k) Plan be invested in the Citigroup Common stock Fund. The requirement was simply that if a portion of the 401(k) Plan were invested in the Citigroup Common stock Fund that portion would be an ESOP. Thus, the 401(k) Plan is not "designed" to invest primarily in qualifying employer securities and the 401(k) Plan's purported ESOP status

14

did not, in fact, require the investment in the Citigroup Common stock Fund at all, or place any constraints on 401(k) Plan fiduciaries forcing them to invest in the Citigroup Common stock Fund.

55.    Similarly, the 401(k) Plan could have held one share of Citigroup common stock and still been an ESOP since that "portion" of the 401(k) Plan -- the one share -- would have been primarily invested in Citigroup common stock.

56.    Finally even if the portion of the 401(k) Plan invested in the Citigroup Common stock Fund constituted an ESOP, Plan fiduciaries may not invest in employer securities regardless of the circumstances. While the duty of diversification may not apply to certain aspects of investment of qualified employer securities in an ESOP, the 401(k) Plan fiduciaries remain bound by their other core ERISA fiduciary duties including the duties to act loyally, prudently and honestly.

57.    Each participant in the 401(k) Plan may elect to make contributions to the 401(k) Plan on a pre-tax basis through payroll deductions from 1% to 50% of such participant's eligible compensation (as defined in the 401(k) Plan document and SPD) for each pay period up to an annual maximum of $15,500 for 2007. In addition, participants who are age 50 or older and have made the maximum contribution to the 401(k) Plan, can make an additional catch up contribution to the 401(k) Plan through payroll deductions from 1% to 50% of eligible compensation to an annual maximum of $5,000 for 2007. A participant can elect to change the rate at which his/her contribution is determined or stop their contribution at any time during the year.

58.    An employee may be eligible for Company matching contributions once the employee has been employed by the Company for 12 full months. The Company matching

contribution automatically will be invested in the Citigroup Common stock Fund. Employees that earn greater than $100,000 are not eligible for Company matching contributions. For eligible employees, the Company will make a contribution according to the following schedule:

| If qualifying compensation for the current year participation is: | For each $1 the employee contributes during the calendar year of participation, the Company will contribute: | To a maximum of: |
|---|---|---|
| $0 to $50,000 | $3 | 3% of eligible pay to maximum of $1,500 annually |
| $50,000.01 to $75,000 | $2 | 3% of eligible pay to maximum of $1,500 annually |
| $$75,000.01 to $100,000 | $1 | 3% of eligible pay to maximum of $1,500 annually |
| Greater than $100,000 | No matching contribution will be made | |

59.    Prior to January 1, 2007, Company matching contributions made to a participant's account were required to stay in the Citigroup Common stock Fund for five Plan years. After five Plan years, the participant could transfer the Company matching contribution made five years earlier (and its earnings) into any of the investment options available at that time. The five-year restriction did not apply once the participant reaches age 55. Effective January 1, 2007, Company matching contributions were no longer subject to the five-year restriction, and can be transferred into other 401(k) Plan investments.

60.    Effective January 1, 2008, Citigroup intends to make certain design changes to the 401(k) Plan, including an increase to the Company matching contribution to a maximum of 6% of the participant's eligible pay. The Company also will make a fixed contribution of up to 2% of eligible pay to the Plan accounts of eligible participants whose total compensation is less than $100,000.

61.    Individual notional accounts are maintained for each 401(k) Plan participant. Each participant's notional account is credited with employee contributions, Company matching contributions and investment earnings, and charged with the allocation of investment losses.

62.    Participants are always 100% vested in contributions to the 401(k) Plan made from their eligible compensation and in amounts rolled over from a former employer's qualified retirement plan or transfer from another plan, and in each case, the earnings thereon. Participants become vested in Company matching contributions and earnings thereon after three years of service to the Company. Participants become 100% vested in Company contributions when they attain age 55, become disabled or terminate employment as a result of death.

63.    Under the terms of the 401(k) Plan, Citigroup incorporates by reference certain information filed with the SEC, including but not limited to Annual Reports on Form 10-K, Quarterly Reports on Form 10-Q, Periodic Reports on Form 8-K, and Registration Statements.

64.    The 401(k) Plan is an "employee pension benefit plan" within the meaning of ERISA. § 3(2)(A), 29 U.S.C. § 1002(2)(A). Further, it is an "eligible individual account plan" within the meaning of ERISA § 407(d)(3), 29 U.S.C. § 1107(d)(3), and also a "qualified cash or deferred arrangement" within the meaning of I.R.C. § 401(k), 26 U.S.C. § 401(k). While the 401(k) Plan is not a party to this action, pursuant to ERISA, the relief requested in this action is for the benefit of the 401(k) Plan pursuant to ERISA § 502(a)(2), 29 U.S.C. § 1132(a)(2).

65.    An employee benefit plan, such as the 401(k) Plan, must be "established and maintained pursuant to a written instrument." ERISA § 402(a)(1), 29 U.S.C. § 1102(a)(1). ERISA requires that every participant in an employee benefit plan be given a Summary Plan Description.

66.     The assets of an employee benefit 401(k) Plan must be held "in trust by one or more trustees." ERISA § 403(a), 29 U.S.C. § 1103(a). During the Class Period, the assets of the 401(k) Plan were held in trust by Citibank.

67.     ERISA and the Internal Revenue Code require that plans file an Annual Report, Form 5500, with the Department of Labor and the Department of the Treasury. The 401(k) Plan filed a Form 5500 in October 2006 that was signed by Defendant Johnson.

68.     As of December 31, 2006, the 401(k) Plan held Citigroup stock with a fair market value of approximately $4.13 billion. Citigroup stock represented approximately 32% of the total invested assets of the 401(k) Plan. As of December 31, 2005, the 401(k) Plan held shares of Citigroup stock with a fair market value of $3.98 billion. This immense holding represented approximately 34% of the total invested assets of the 401(k) Plan.

69.     Upon information and belief, Citigroup stock represented a significant portion of the total invested assets of the 401(k) Plan throughout the Class Period.

**The Citibuilder Plan**

70.     The Citibuilder Plan is a defined contribution 401(k) plan that commenced activities on January 1, 2001, and covers eligible employees of Citibank, a subsidiary of Citigroup, and its affiliates who primarily reside and work in Puerto Rico. Citigroup encourages its eligible employees to become active participants in the Citibuilder Plan and saving for their financial future. According to the SPD for the Citibuilder Plan, the Citibuilder Plan is a convenient way for employees to save for retirement through tax-deferred contributions from their pay. A full-time employee of the Company is eligible to participate in the Citibuilder Plan beginning with the first pay period following their date of hire. A part-time employee of the Company is eligible to participate on the January 1 or July 1 after they work at least 1,000 hours

18

during their first 12 months with the Company or 1,000 hours in any calendar year after their

date of hire. Citibuilder Plan has an automatic enrollment feature to encourage savings from the

time employees begin working at Citigroup. As a full-time employee, that individual will be

enrolled in the Citibuilder Plan automatically 90 days from the date of hire. At that time, 3% of

the employee's eligible pay will be deducted each pay period and deposited into the Citi

Institutional Liquid Reserves Fund. If an employee does not want to contribute to the Citibuilder

Plan, they will need to opt out within 90 days of their hire date.

71.    Each participant in the Citibuilder Plan may elect to make contributions to the

Citibuilder Plan on a pre-tax basis through payroll deductions from 1% to 10% of such

participant's eligible compensation (as defined in the Citibuilder Plan document and SPD) for

each pay period up to an annual maximum of $8,000 for 2006.

72.    An employee may be eligible for Company matching contributions once the

employee has been employed by the Company for 12 full months. The Company matching

contribution automatically will be invested in the Citigroup Common stock Fund. Employees

that earn greater than $100,000 are not eligible for Company matching contributions. For other

eligible employees, the Company will make a contribution according to the following schedule:

| If qualifying compensation for the current year participation is: | For each $1 the employee contributes during the current year of participation, the Company will contribute: | To a maximum of: |
|---|---|---|
| $0 to $50,000 | $3 | 3% of eligible pay to maximum of $1,500 annually |
| $50,000.01 to $75,000 | $2 | 3% of eligible pay to maximum of $1,500 annually |
| $$75,000.01 to $100,000 | $1 | 3% of eligible pay to maximum of $1,500 annually |
| Greater than $100,000 | No matching contribution will be made | |

73.    Prior to January 1, 2007, Company matching contributions made to a participant's account were required to stay in the Citigroup Common stock Fund for five Plan years. After five Plan years, the participant could transfer the Company matching contribution made five years earlier (and its earnings) into any of the investment options available at that time. The five-year restriction did not apply once the participant reaches age 55. Effective January 1, 2007, Company matching contributions were no longer subject to the five-year restriction, and can be transferred into other Plan investments.

74.    Effective January 1, 2008, Citigroup intends to make certain design changes to the Citibuilder Plan. The Company matching contribution will be increased to provide a two-for-one match on the first 3% of the participant's eligible pay for eligible employees at all compensation levels. The Company also will make a fixed contribution of up to 2% of eligible pay to the Plan accounts of eligible participants whose total compensation is less than $100,000.

75.    Individual notional accounts are maintained for each Citibuilder Plan participant. Each participant's notional account is credited with employee contributions, Company matching contributions and investment earnings, and charged with the allocation of investment losses.

76.    Participants are always 100% vested in contributions to the Citibuilder Plan made from their eligible compensation and in amounts rolled over from a former employer's qualified retirement plan or transfer from another plan, and in each case, the earnings thereon. Participants become vested in Company matching contributions and earnings thereon after three years of service to the Company. Participants become 100% vested in Company contributions when they attain age 55, become disabled or terminate employment as a result of death.

77.    Under the terms of the Citibuilder Plan, Citigroup incorporates by reference certain information filed with the Securities and Exchange Commission, including but not

20

limited to Annual Reports on Form 10-K, Quarterly Reports on Form 10-Q, Periodic Reports on Form 8-K, and Registration Statements.

78.     The Citibuilder Plan is an "employee pension benefit plan" within the meaning of ERISA. § 3(2)(A), 29 U.S.C. § 1002(2)(A). Further, it is an "eligible individual account plan" within the meaning of ERISA § 407(d)(3), 29 U.S.C. § 1107(d)(3), and also a "qualified cash or deferred arrangement" within the meaning of I.R.C. § 401(k), 26 U.S.C. § 401(k). While the Citibuilder Plan is not a party to this action, pursuant to ERISA, the relief requested in this action is for the benefit of the Citibuilder Plan pursuant to ERISA § 502(a)(2), 29 U.S.C. § 1132(a)(2).

79.     An employee benefit plan, such as the Citibuilder Plan, must be "established and maintained pursuant to a written instrument." ERISA § 402(a)(1), 29 U.S.C. § 1102(a)(1). ERISA requires that every participant in an employee benefit plan be given a Summary Plan Description.

80.     The assets of an employee benefit Citibuilder Plan must be held "in trust by one or more trustees." ERISA § 403(a), 29 U.S.C. § 1103(a). During the Class Period, the assets of the Citibuilder Plan were held in trust by Banco Popular de Puerto Rico.

81.     ERISA and the Internal Revenue Code require that plans file an Annual Report, Form 5500, with the Department of Labor and the Department of the Treasury.

82.     As of December 31, 2006, the Citibuilder Plan held Citigroup stock with a fair market value of approximately $7.4 million. Citigroup stock represented approximately 32% of the total invested assets of the Citibuilder Plan. As of December 31, 2005, the Citibuilder Plan held shares of Citigroup stock with a fair market value of approximately $7 million. This immense holding represented approximately 34% of the total invested assets of the Citibuilder Plan.

83.    Upon information and belief, Citigroup stock represented a significant portion of the total invested assets of the Citibuilder Plan throughout the Class Period.

## CLASS ACTION ALLEGATIONS

84.    Plaintiff brings this action as a class action pursuant to Rules 23(a), (b)(1), (b)(2), and (b)(3) of the Federal Rules of Civil Procedure on behalf of themselves and a class consisting of all current and former participants (and beneficiaries thereof) of the Plans, whose individual accounts included investments in Citigroup stock during the Class Period of January 1, 2007 through the present. Excluded from the Class are Defendants, members of the Defendants' immediate families, any officer, director, or partner of any Defendant, any entity in which a Defendant has a controlling interest, and the heirs, successors, or assigns of any of the foregoing.

85.    This action is properly maintainable as a class action because:

(a)    The members of the Class are so numerous that joinder of all members is impracticable. While the exact number of Class members is unknown by Plaintiffs at this time, and can only be ascertained through appropriate discovery, Plaintiff believes that there are, at a minimum, thousands of members of the Class.

(b)    Plaintiff's claims are typical of those of the Class because Plaintiff, members of the Class and the Plans suffered similar harm and damages as a result of Defendants' systematic unlawful conduct described herein. Absent a class action, the Plans and/or members of the Class may not receive restitution or other appropriate relief, will continue to suffer losses, and these violations of law will proceed without remedy.

(c)    Plaintiff is a representative party who will fairly and adequately protect the interests of the other members of the Class and have retained counsel

22

competent and experienced in class action litigation. Plaintiff has no interests antagonistic to, or in conflict with, the Class they seek to represent.

(d)    A class action is superior to other available methods for the fair and efficient adjudication of the claims asserted herein. Prosecution of separate actions by members of the Class would create a risk of inconsistent adjudications with respect to individual members of the Class, which would then establish incompatible standards of conduct for Defendants. As the damages suffered by the individual Class members, direct or indirect through their participation in the Plans may be relatively small, the expense and burden of individual litigation make it virtually impossible for the Class members individually to redress the wrongs done to them and/or the Plan. The likelihood of individual Class members prosecuting separate claims is remote. Furthermore, Defendants' conduct affected and affects all Class members in a similar manner, making declaratory and injunctive relief to the Class as a whole appropriate.

86.    The questions of law and fact common to the members of the Class predominate over any questions affecting individual members of the Class. The questions of law and fact that are common to Plaintiff and the Class include, among others:

(a)    Whether ERISA applies to the claims at issue;

(b)    Whether Defendants owe and owed fiduciary duties to the members of the Class;

23

(c)   The nature of the fiduciary duties Defendants owe or owed to members of the Class;

(d)   Whether Defendants breached their fiduciary duties; and

(e)   The extent of losses sustained by the Plans, and thereby members of the Class, and the appropriate measure of relief.

87.   Plaintiff anticipates no unusual difficulties in the management of this action as a class action.

## DEFENDANTS' FIDUCIARY STATUS

88.   During the Class Period, upon information and belief, Defendants had discretionary authority with respect to the management of the Plans and/or management or disposition of the Plans' assets.

89.   During the Class Period, all of the Defendants acted as fiduciaries of the Plans pursuant to § 3(21)(A) of ERISA, 29 U.S.C. § 1002(21)(A), and the law interpreting that section.

90.   **Named Fiduciaries**. ERISA requires every plan to provide for one or more named fiduciaries of the Plans pursuant to ERISA § 402(a)(1)-(2), 29 U.S.C. § 1102(a)(1) and (2). Upon information and belief, the Committee Defendants are Named Fiduciaries under the Plans. In addition, the Citigroup Defendants are Named Fiduciaries since they were appointed the Plans' Administrator.

91.   **De Facto Fiduciaries**. ERISA treats as fiduciaries not only persons explicitly named as fiduciaries under § 402(a)(1), but also any other persons who act in fact as fiduciaries, i.e., perform fiduciary functions (including a juridical person such as Citigroup). ERISA § 3(2 E)(A)(i), 29 U.S.C. § 1002(21)(A)(i), makes a person a fiduciary "to the extent . . . he exercises any discretionary authority or discretionary control respecting management of such plan or exercises any authority or control respecting management or disposition of its assets . . . or . . .

24

has any discretionary authority or discretionary responsibility in the administration of such plan."

During the Class Period, all of the Defendants performed fiduciary functions under this standard,

and thereby also acted as fiduciaries under ERISA, by, among other things, the conduct alleged

in ¶¶ 153-245.

### DEFENDANTS' FIDUCIARY DUTIES UNDER ERISA

92.     ERISA is a comprehensive statute covering virtually all aspects of an employee

benefit plan, including retirement savings plans, such as the Plans.  The goal of ERISA is to

protect the interests of the Plans' participants and their beneficiaries:

> It is hereby declared to be the policy of this chapter to protect
> interstate commerce and the interests of participants in employee
> benefit Plan and their beneficiaries, by requiring the disclosure and
> reporting to participants and beneficiaries of financial and other
> information with respect thereto, by establishing standards of
> conduct, responsibility, and obligation for fiduciaries of employee
> benefit Plan, and by providing for appropriate remedies, sanctions,
> and ready access to the Federal courts.

ERISA § 2(b), 29 U.S.C. § 1001(b).

93.     Under ERISA, those responsible for employee benefit plan management stand in

a fiduciary relationship to plan participants.  Pursuant to ERISA, a "fiduciary" is defined broadly

to include all persons or entities that are able to exercise discretionary authority over the

management of a plan or the payment of benefits.  29 U.S.C. § 1002(21)(A).  ERISA requires

strict fidelity and loyalty in the execution of the plan's management.

94.     ERISA imposes on Defendants, who are responsible for the Plans, the

requirement to "discharge his [or her] duties with respect to a plan solely in the interest of the

participants and their beneficiaries and . . . with the care, skill, prudence, and diligence under the

circumstances then prevailing that a prudent man acting in a like capacity and familiar with such

matters would use in the conduct of an enterprise of a like character and with like aims."  ERISA

§ 404(a)(1)(B), 29 U.S.C. § 1104(a)(1)(B).

95.     ERISA also imposes on Defendants responsible for the Plans a duty of loyalty, requiring these Defendants to "discharge his [or her] duties with respect to a plan solely in the interest of the participants and their beneficiaries and . . . for the exclusive purpose of . . . providing benefits to the participants and their beneficiaries." ERISA § 404 (a)(1)(A)(i), 29 U.S.C. § 1104(a)(l)(A)(i).

96.     Other duties imposed upon Defendants who are fiduciaries under ERISA by virtue of their exercise of authority or control respecting the management of the Plans or disposition of Plans' assets, include but are not limited to:

>   (a)     The duty to investigate and evaluate the merits of decisions affecting the use and disposition of Plans' assets;

>   (b)     The duty to evaluate all investment decisions with "an eye single" to the interests of Plans' participants and beneficiaries;

>   (c)     The duty to avoid placing themselves in a position where their acts as officers, directors, or employees of the Company will prevent their functioning with the complete loyalty to participants demanded of them as plan fiduciaries and, if they find themselves in such a position, to seek independent, unconflicted advice;

>   (d)     To the extent that a party is responsible for appointing and removing fiduciaries, the duty to monitor those persons who have been named which includes, among other things:  (1) the duty to ensure that the appointed fiduciary possesses the needed credentials to fulfill his or her duties, (2) the duty to make sure that the appointed fiduciary has adequate knowledge to fulfill his or her duties,  (3) the duty to insure that the

appointed fiduciary has access to and retains impartial advisers when needed; (4) the duty to require that the appointed fiduciary report regularly to the monitoring fiduciary; and (5) the duty to remove a fiduciary if that fiduciary has breached his or her fiduciary duty or is not performing his or her fiduciary functions in accordance with ERISA;

(e)     The duty to disclose and inform the Plans' Participants of any material adverse information about the Plans that duty entails, among other things: (1) a duty not to make materially false statements or misinform the Plans' participants concerning any aspect of the Plans including its investments; (2) an affirmative duty to inform the Plans' participants about material adverse factors that were affecting the Plans or its investments at any time the fiduciary knew or should have known, pursuant to his duty to investigate, that failing to make such a disclosure might be harmful; and (3) when a plan is composed of various investment funds, the duty to inform and disclose also includes the duty to impart to plan participants material information that the fiduciary knows or should know is sufficient to appraise the average plan participant of the comparative risks associated with investing in any particular investment;

(f)     A duty to insure that investments were not purchased at a price above what the Defendants, but not the participants and beneficiaries, knew or should have known to be in excess of fair market value as defined in the relevant Treasury regulations and in most instances at a price that renders

27

it improbable that the investments will bring a fair return commensurate with the prevailing rates;

(g)     A duty to diversify the Plans' investments to minimize the risk of large losses to the Plans and its participants; and

(h)     The duty to not blindly follow plan documents if doing so leads to an imprudent result. A fiduciary may not avoid fiduciary responsibility by relying solely on the language of plan documents.

97.     ERISA permits the fiduciary function to be shared among various individuals and entities. Given ERISA's functional concept of a fiduciary, absent formal discovery it is impossible to know the full extent of which fiduciaries exercised which fiduciary functions.

98.     Insofar as the Plans were not properly diversified funds and therefore more risky to the Plans' participants, the Defendants had heightened fiduciary duties to the Plans' participants with respect to the Plans' investment in Citigroup stock, including heightened duties to disclose all material information relevant to investments in Citigroup stock.

99.     A fiduciary is liable not only for the fiduciary's own breach, but is also liable as a co-fiduciary if:

(a)     the fiduciary participates knowingly in, or knowingly undertakes to conceal, an act or omission of another fiduciary, knowing such act or omission is a breach; or

(b)     if, by the fiduciary's failure to comply with ERISA § 404(a)(1), 29 U.S.C. § 1104 (a)(1) in the administration of his specific responsibilities that gives rise to fiduciary status, the fiduciary enables another fiduciary to commit a breach; or

28

(c)    the fiduciary knew or should have known of a breach by such other

fiduciary and does not make reasonable efforts under the circumstances to

remedy the breach.

## CITIGROUP STOCK WAS AN IMPRUDENT INVESTMENT FOR THE PLANS

### Background of the Subprime Lending Industry

100.    Subprime lending is the practice of making mortgage loans to persons who are

generally unable to access credit from traditional financial institutions because they do not

satisfy credit, documentations or other underwriting standards mandated by these traditional

mortgage lenders and loan buyers, which typically lend only to more credit-worthy borrowers.

101.    Because subprime borrowers are seen as "higher risk," their loans carry interest

rates that are at least 2 percentage points higher than those offered to borrowers with better

credit.  So, for example, while a credit-worthy borrower could get a mortgage at 5% interest, the

same mortgage would cost a subprime customer 7% interest or more.

102.    The subprime market has grown rapidly in recent years.  In 1994, fewer than

5% of mortgage originations in the United States were subprime, but by 2005 about 20% of

mortgage originations were subprime.  The greater access to subprime mortgages has helped

homeownership grow.

103.    Subprime mortgages totaled $600 billion last year, accounting for about one-fifth

of the U.S. home loan market.  An estimate of $1.3 trillion in subprime mortgages are currently

outstanding.

104.    The rapid growth of the subprime lending industry has been attributed to a

number of factors that occurred in 2004 and 2005.  These factors include rising home prices,

declining affordability, historically low interest rates, intense lender competition, innovations in

the structure and marketing of mortgages, and an abundance of capital from lenders and mortgage securities investors.

105.    The mortgage market was further fueled by significant mortgage-backed securities liquidity, with investors increasingly seeking yield through higher risk securitizations that allow financial institutions to access the capital markets to fund mortgage operations, while simultaneously transferring credit risk away from the institutions and to securitization investors. The share of U.S. mortgage debt held outside the government-sponsored enterprises by private mortgage-backed securitizations doubled between 2003 and 2005, helping to fuel the growth of subprime and nontraditional mortgages.

106.    From 2001 to mid-2004, prime borrowers with a preference for fixed-rate mortgages refinanced in record numbers as long-term interest rates fell to the lowest rates in a generation. As interest rates began to rise in 2004 and the pool of potential prime borrowers looking to refinance shrank, lenders struggled to maintain or grow market share in a declining origination environment, and did so by extending loans to subprime borrowers with troubled credit histories.

107.    Lenders accommodated these borrowers by diversifying mortgage offerings as they competed to attract borrowers and meet prospective homebuyers' financing needs. Because of the affordability aspect already noted, borrowers increasingly turned to products such as payment option and interest-only (IO) loan structures in 2004 and 2005. These "nontraditional" mortgages are specifically designed to minimize initial mortgage payments by eliminating or relaxing the requirement to repay principal during the early years of the loan. Payment option and interest-only loans appear to have made up as much as 40 to 50% of all subprime and Alt-A loans securitized by private issuers of mortgage-backed securities during 2004 and 2005, up from

10% in 2003. The majority of subprime originations over the past several years were "2/28 and 3/27" hybrid loan structures. These hybrid loans provide an initial fixed-rate period of two or three years, after which the loan converts to an adjustable-rate mortgage and the interest rate adjusts to the designated loan index rate for the remaining 28 or 27 years of the loan. The 2/28 and 3/27 loan products accounted for almost three-quarters of subprime securitized mortgages in 2004 and 2005.

108.   Subprime lenders also eased lending standards to take advantage of these borrowers, including limited or no verification of borrower income and high loan-to-value transactions.

109.   In late 2004 and early 2005, there was a growing sense of concern regarding the subprime industry, and in particular the eased lending standards. To address those concerns, the Federal Reserve and other banking agencies issued guidance on subprime lending. The Interagency Guidance on Nontraditional Mortgage Product Risks highlights sound underwriting procedures, portfolio risk management, and consumer protection practices that institutions should follow to prudently originate and manage nontraditional mortgage loans. A major aspect of this guidance is the recommendation that a lender's analysis of repayment capacity should include an evaluation of the borrower's ability to repay debt by final maturity at the fully indexed rate, assuming a fully amortizing repayment schedule. The guidance also reminds institutions that they should clearly communicate the risks and features of these products to consumers in a timely manner, before consumers have applied for a loan.

110.   In 2006, mortgage interest rates hit four-year highs, the volume of home sales declined and the rate of home price appreciation decelerated and in some cases home prices fell, leaving the most recent subprime borrowers vulnerable to payment difficulties. Subprime

31

borrowers with ARMs experienced a large increase in delinquency and foreclosure rates, while prime borrowers experienced almost no increase in delinquencies and foreclosures. Borrowers were not able to avoid sharp payment increases as they could in earlier years. Even borrowers with enough equity to refinance their adjustable rate mortgages faced difficulty finding a loan with affordable payments, as interest rates edged higher than in earlier years.

111. Moreover, an unusually large number of subprime loans defaulted shortly after origination. In many of these "early payment defaults," borrowers stopped making payments before they faced payment shocks, suggesting that in 2006 some lenders may have lowered their underwriting standards in the face of reduced borrower demand for credit. Because of the rapid expansion of subprime lending in recent years, lenders, investors, and ratings agencies had limited data with which to model credit risk posed by new borrowers or novel mortgage types, and so may have underestimated the risk involved. Several lenders have already been forced out of the subprime market, in part because of the wave of early payment defaults on mortgages they originated.

112. Instead of holding mortgage loans generally, lenders sell subprime mortgages that are bundled into bonds and offer them to individual and institutional investors.

113. In 2006, approximately 80,000 subprime borrowers who took out mortgages that were packaged into securities fell into delinquency and during the first half of 2007, dozens of lenders participating in the subprime mortgage business ceased operating as defaults and delinquencies on recent loans skyrocketed.

Citigroup's Participation in the Subprime Market

114.    Conduits and SIVs are investment vehicles that banks use to issue commercial paper. Until recently, they were considered to be highly rated, short-term notes that offered investors a safe-haven investment with a yield slightly above certificates of deposit or government debt.

115.    SIVs use the proceeds from the issuance of commercial paper to purchase longer-term investments such as corporate receivables, auto loans, credit-card debt or mortgages. Banks profit from the SIVs by pocketing the spread between the rate at which they borrow money and the rate at which they lend money.

116.    The vehicles are often established in a tax haven and are run solely for investment purposes as opposed to typical corporate activities.

117.    It is difficult for investors to assess the financial risks imposed by SIVs or conduits because they are off-the-balance-sheet entities. "Citigroup structured these vehicles so that they wouldn't be included on its books. The vehicles are created as corporate zombies that ostensibly aren't owned or controlled by anyone. In that case, accounting rules say consolidations of such vehicles is determined by who holds the majority of risks and rewards connected to them." *See* David Reilly, *Citi's $41 Billion Issue:  Should It Put CDOs on the Balance Sheet?* WALL ST. J., Nov. 16, 2007, at C1.

118.    Upon information and belief Citigroup operates conduits and SIVs that have assets totaling at least $60 billion. *See* David Reilly, (*Post-Enron rule changes kept banks' risks in dark-- Investors still found it hard to figure out what was going on,*) WALL ST. J., Oct. 17, 2007.

119.    Citigroup represented to money market fund managers and other investors that SIVs were safe investments that use the proceeds from the issuance of commercial paper and short-term notes to invest strictly in high-quality debt securities. *See Capital Markets: Team of the Month- Citigroup SIV Enters Uncharted Space- Citigroup Alternative Investments Last Month Launched A Pioneering Structured Investment Vehicle. It Boosts Leverage to the Subordinated Noteholder Without Really Increasing The R,* The Banker, Oct 1, 2004; *Citigroup creates bespoke SIV for mystery ABS investor; Structured investment vehicle; asset backed securities; Citigroup, Inc.,* Euromoney Institutional Investor, Nov. 10, 2006.

120.    Investors, including money market funds, have pulled back from debt sold by SIVs because of their exposure to subprime mortgage securities. Because SIVs still owe money to commercial-paper holders, and cannot raise money by selling new commercial paper, they are being forced to sell their assets at fire-sale prices to pay off debt.

121.    Citigroup's conduits are on the brink of collapse, subjecting the Company to billions of dollars of liability as a result of investor lawsuits for causing conduits to issue debt based on materially false and misleading statements.

122.    In addition, Citigroup may end up having to move its conduits onto its balance sheets thereby causing it to recognize billions of dollars in potential liability that it had not adequately disclosed to investors and Plan Participants. *See* Peter Eavis, *Behind the Citigroup Rescue*, Fortune, Oct. 15, 2007. "If Citigroup had to include an additional $41 billion in CDO assets on its books, that could potentially spur a further $8 billion in write-downs, above and beyond those already signaled." *See* David Reilly, *Credit Crunch--Heard on the Street: For Banks, the Hurt Just Goes On-- Citi's $41 Billion Issue: Should It Put CDOs On the Balance Sheet?* WALL ST. J., Nov. 26, 2007, at C1.

**Citigroup Failed to Disclose Material Adverse Information Concerning Its Subprime
Assets To the Plans' Participants and Failed to Provide the Plans' Participants With
Complete and Accurate Information Regarding Its Loan Loss Exposure**

123.    On January 19, 2007, Citigroup announced its financial results for the year ended

December 31, 2006, and for the fourth quarter ended December 31, 2006. The Company

reported net income for the 2006 fourth quarter of $5.13 billion, record quarterly revenues of

$23.8 billion, record full year 2006 revenues of $89.6 billion, and record full year 2006 income

from continuing operations of $21.2 billion.

124.    Defendant Prince touted these results in a Company press release, stating "Our

results were highlighted by double-digit revenue growth in our corporate and investment

banking, wealth management and alternative investment businesses. In U.S. consumers, we

continued to see positive trends from our strategic actions."

125.    On a January 19, 2007 Investor Conference Call discussing the Company's fourth

quarter 2006 results, a UBS analyst inquired as to why loan loss reserves had not changed when

there had been a pick up on Citigroup's Consumer loans. Citigroup's Chief Financial Officer

("CFO") at the time, Sallie Krawcheck, stated that:

> "...we believe that we have adequate reserves, we believe we have
> the right level of reserve for what we are seeing in terms of the
> growth in the portfolio, what we see in terms of the embedded loss
> in the portfolio. And as the environment changes the complexion,
> the portfolio, changes, etc., we review that. We have I guess to go
> along with the guys that have the pocket protectors or the Ph.D.
> guys who look at the reserves and we feel very good, very good
> about the level of them."

126.    On February 9, 2007, shares of Citigroup fell 1.2% to $54.31 after Britain's

HSBC Holdings, Europe's largest bank, warned that bad debts from its U.S. mortgage lending

business would hurt results.

127.    On February 23, 2007, Citigroup filed its Form 10-K for the year ended

December 31, 2006, with the SEC. The Company reported that it earned $21.2 billion from

continuing operations on revenues of $89.6 billion; income was up 7% from 2005, while diluted EPS from continuing operations increased 11%, with the increment in the growth rate reflecting the benefit from its share repurchase program; and net income, which includes discontinued operations, was $21.5 billion, down 12% from the prior year, reflecting the absence of significant sales of businesses recorded in 2005.

128.    The Company's comments on its 2007 outlook were, for the most part, optimistic. It stated that it expected continued growth in loans, earnings per share and revenue. In addition it stated "Credit is broadly stable as 2007 begins; however, we are budgeting for a moderate deterioration of credit in 2007. In addition, the tax benefits we realized in 2006 will not be repeated in 2007, and we anticipate the effective tax rate to return to a more normalized rate of 30% to 31%, not the 27.3% recorded in 2006."

129.    With respect to U.S. Consumer Lending Divisions, the 2006 10-K stated that "Provisions for loan losses and for benefits and claims increased primarily on higher credit losses in the Real Estate Lending and Auto businesses, partially offset by higher loan loss reserve releases of $63 million in the Real Estate business. Credit losses increased due to volume growth and seasoning in Real Estate, as well as volume growth in Autos."

130.    Far from disclosing any problems with its subprime loan portfolio in its Form 10-K, Citigroup led investors and Plan Participants to believe that its subprime loss exposure from 2004 to 2005 was minimal, stating that "Non-prime mortgage originations declined 20%, reflecting the Company's decision to avoid offering teaser rate and interest-only mortgages to lower FICO score customers."

131.    On February 25, 2007, Citigroup announced that it replaced its CFO Sallie Krawcheck with Gary Crittenden. Gary Crittenden came to Citigroup from American Express Company where he was the Company's chief financial officer for the last six years.

132.    On April 16, 2007 Citigroup reported net income for the first quarter of 2007 as $5.01 billion, or $1.01 per share. In a press release Citigroup stated "U.S. consumer revenue growth continued to trend positively, up 6%."

133.    On the same day, Citigroup held an investor conference call to discuss the Company's first quarter financial results. On that call, UBS Analysts Glenn Schorr questioned CFO Crittenden as to whether $9 billion worth of loans held by Citigroup were no documentation or low documentation loans. Crittenden refused to answer the question and implied that the loans were profitable.

134.    Also during the April 16, 2007, conference call, CEO Defendant Prince expressed his pleasure at the fact that Citigroup had achieved "positive operating leverage" and stated that "We are delivering our plan."

135.    Citigroup's profit for the first quarter of 2007 was $1.18 per share, beating analyst estimates of $1.10. The stock reached a high of $53.39 on that news, a 3.9% increase from its closing price of $51.60 on April 13, 2007.

136.    These comments left investors and analysts with the impression that Citigroup's loan loss exposure was minimal. For example, Paul Nolte, a director of investments at money management firm Hinsdale Associates, was quoted as saying that "One of the question marks coming into earnings season has been the mortgage issue, and Citigroup making positive comments about its business has lent some strength to the overall market." Rob Kelley and Grace Wong, *Stock Soar on Earnings Deals,* CNNMoney.com, April 16, 2007.

The Truth Comes To Light

137.    On June 20, 2007, before the market opened for the day, the media reported that
two hedge funds controlled by The Bear Stearns Companies, Inc., ("Bear Stearns") that held
$20 billion in investments, mostly in complex securities comprised of bonds backed by subprime
mortgages, were close to being shut down. *See* Kate Kelly, Serena Ng and David Reilly, *Two
Big Funds At Bear Stearns Face Shutdown-- As Rescue Plan Falters Amid Subprime Woes,
Merrill Asserts Claims,* WALL ST. J., June 20, 2007, at A1.

138.    This news would have wide-ranging consequences for Wall Street, and as
investors correctly speculated, for Citigroup which would have similar problems. Shares of
Citigroup common stock fell from a closing price of $54.26 on June 19, 2007 to close at $51.15
on June 25, 2007, representing a 5.7% decline in less than a week.

139.    On July 20, 2007, before the close of the market, Citigroup reported net income
for the second quarter of 2007 of $6.23 billion, or $1.24 per share, both up 18%. Citigroup
continued to portray a positive image of the Company. Defendant Prince stated in a press release
that "We continued to generate revenue and volume growth in our U.S. consumer franchise,
while making excellent progress in re-weighting Citi towards our other businesses .... Our
capital markets driven businesses performed extremely well and international consumer revenues
grew at a double digit pace."

140.    But on an investor conference call that day, Citigroup was forced to reveal that it
had been actively managing down its subprime exposure and had reduced its exposure "over the
last six months." Further, during the second quarter of 2007, Citigroup's profits from consumer
banking fell 15% as credit costs increased by $934 million. Citigroup increased its loan loss
reserves by $465 million, citing higher delinquencies in second mortgages in consumer lending

and announced that it expected to see continued deterioration in consumer-credit quality through the second half of the year, stating that it would probably have to make "meaningful additions" to its loss reserves.

141.    Citigroup stock sharply declined over the next week after news that it would probably suffer meaningful losses in the second half of the year. From July 19, 2007, to the end of the day on July 27, 2007, Company stock declined 8.2%, wiping our $20.8 billion in market share.

142.    Citigroup's 10-Q for the second quarter ended June 30, 2007, which was filed on August 3, 2007, reflected a steep increase in credit costs: "Credit costs increased $934 million or 59%, primarily driven by an increase in net credit losses of $259 million and a net charge of $465 million to increase loan loss reserves. The $465 million net charge compares to a net reserve release of $210 million in the prior-year period. The build in U.S. Consumer was primarily due to increased reserves to reflect: higher delinquencies in second mortgages in U.S. Consumer Lending, a change in estimate of loan losses inherent in the U.S. cards portfolio and portfolio growth."

143.    On October 1, 2007, Citigroup announced that its third quarter results would be adversely affected by dislocation in the mortgage-backed securities and credit markets and deterioration in the consumer credit environment. It estimated a decline in net income of approximately 60% compared to the same quarter of the prior year. Citigroup's stated losses included a $1.4 billion write-off in its $57 billion portfolio of highly leveraged loans, a loss of about $1.3 billion on the value of securities backed by subprime loans, and a loss of $600 million in fixed-income credit trading.

144.    On October 15, 2007, Citigroup reported poor financial results for the third quarter and announced that write-offs were actually a half billion dollars more than the Company had predicted just two weeks before.

145.    On October 13, 2007, media reports emerged that Citigroup and other banks affected by the subprime debacle had been in discussions with the United States Treasury Department regarding the creation of a superfund to create liquidity for SIVs and conduits. "The banks hope the creation of a Master Liquidity Enhancement Conduit of M-LEC, will prevent turmoil in mortgage-backed facilities from further spilling into other parts of the credit market. Not controlling the spillover could force a fire sale of distressed assets, making borrowers more reluctant to lend." Christopher Rugaber, *Fund will help avoid a short-term crisis, but could leave longer-term problems unresolved*, AP, Oct. 17, 2007. However, critics have been skeptical of this approach. "They're just trying to buy time,' said Christopher Whalen, managing director of Institutional Risk Analytics, a consulting firm." *Id.*

146.    U.S. Secretary of the Treasury Henry M. Paulson, Jr., also weighed in on the use of SIVs and conduits by Citigroup and others. On October 16, 2007 Paulson characterized the conduct of some mortgage market participants as "shameful." Paulson also criticized banks' exposure to off-balance sheet vehicles like Citigroup's conduits stating that "bank regulators must evaluate regulatory capital requirements applicable to bank exposures to off-balance sheet vehicles," adding that the U.S. Treasury would "review the accounting rules" for these special purpose entities." *Secretary Paulson Speaks on Current Housing and Mortgage Market Developments*, US Fed News Oct. 16, 2007.

147.    Citigroup stock continued to drop upon the Company's disclosure of an additional $500 million in losses coupled with media reports about its multi-billion dollar exposure to off balance sheet SIVs and conduits.

148.    On November 1, 2007, CIBC World Markets and Credit Suisse downgraded Citigroup stock amid reports that Citigroup would be required to disclose billions more in losses. On that day shares fell 6.8% to their lowest level since May 2003 and the stock's biggest one-day drop since September 2002.

149.    After the close of the market on November 2, 2007, the media reported that an emergency meeting of Citigroup's Board would take place over the weekend and that Defendant Prince would resign.

150.    The next day, a Wall Street Journal article reported that the SEC was investigating Citigroup's accounting of off-balance-sheet transactions and that the SEC was "taking a broad look at how brokerage firms valued assets tied to high-risk mortgages and whether they were timely in their disclosure of losses to investors." Robin Sidel, Monica Langley and Gregory Zuckerman, *Citigroup CEO Plans to Resign As Losses Grow-- Bank's Board to Meet With Prince on Sunday; SEC Queries Accounting*, WALL ST. J., Nov. 3, 2007, at A1.

151.    On November 4, 2007, Citigroup announced that Prince had resigned. In addition, the Company announced "significant declines" in the fair value of approximately $55 billion in U.S. subprime-related direct exposures in its Securities and Banking business and estimated that reduction in revenues attributable to these declines ranged from about $8 billion to $11 billion dollars, far surpassing the approximately $2.2 billion in mortgage-related write-downs and trading losses that Citigroup had reported in its third quarter earning the previous month.

41

152.    Citigroup stock fell 30.5% as of November 5, 2007, from its price of $37.73 on
June 19, 2007, as the Company slowly began to reveal the truth regarding is dire financial
conditions. This amount represents a loss of $81.2 billion in market value in a period of less than
six months.

### CONDUCT CONSTITUTING DEFENDANTS' FIDUCIARY BREACHES

153.    ERISA imposes strict fiduciary duties of loyalty and prudence upon the
Defendants as fiduciaries of the Plans. The Defendants breached their duties to prudently and
loyally manage the Plans' assets because, during the Class Period, Defendants knew or should
have known that Company stock was not a prudent investment for the Plans and knew or should
have known that the value of Company stock was exposed to an unacceptable risk of loss.

154.    Defendants' knowledge that the Company stock was an imprudent investment is
based on the fact that Defendants knew or should have known of the unsound business practices
and risky lending activities and other misrepresentations alleged herein. Defendants failed to
take adequate steps to prevent the Plans, and indirectly the participants, from suffering losses as
a result of the Plans' investments in Company stock.

155.    Upon information and belief, not one of the Defendants conducted an appropriate
investigation into whether Company stock was a prudent investment for the Plans in light of the
Company's risky exposure to the subprime credit market and other related serious corporate
misconduct and given the fact that the Plans held enormous investments in Company stock.
Moreover, not one of the Defendants provided the Plans' participants with information regarding
the true nature of these business practices and the extraordinary risks that they presented to
Citigroup such that the Plans' participants could make informed decisions regarding the
Company stock in the Plans. Indeed, not one of the Defendants took any meaningful action to

42

protect the Plans against the risk of enormous losses as a result of the Company's very risky and inappropriate corporate misconduct.

156.    On a Class-wide and Plan-wide basis the risk of an undiversified investment in Company stock imposes a greater risk than that of other undiversified investments.

157.    The risk associated with the investment in Company stock during this time of unsound business practices was an extraordinary risk, far above and beyond the normal, acceptable risk associated with investment in company stock. This abnormal investment risk could not have been known by the Plans' participants, and the Defendants knew or should have known that it was not known by them because the Defendant fiduciaries never disclosed it. This extraordinary risk made any investment in Company stock inappropriate and imprudent.

158.    Participants, even before placing any retirement savings in Company stock, relied on the stability and financial viability of Citigroup as the basis for their standard of living. The participants' salaries, healthcare and other benefits, as well as the participants' pension (if any) and retirement health insurance depended upon Citigroup's continued solvency and viability.

159.    Thus, one of the risks that could impair the participant's investment in Company stock – the failure or insolvency of the employer – would also cause the loss of current income and benefits and future non-Plan related retirement benefits. The risks are correlated and, if realized, would financially devastate most employees and participants in the Plans. Therefore, the Defendants had a heightened duty with regard to both the decision to continue investing in Company stock as well as the duty to inform participants concerning the imprudence of investing in Company stock.

160.    Defendants breached their fiduciary duties when they failed to conduct an appropriate investigation into whether Citigroup stock was a prudent investment for the Plans;

failed to develop appropriate investment guidelines for Citigroup stock; failed to divest the Plans

of Citigroup stock; failed to discontinue further contributions of Citigroup stock to the Plans;

failed to remove Citigroup stock as an investment option for the Plans; failed to either consult or

appoint independent fiduciaries regarding the appropriateness of an investment in Citigroup

stock; and failed to resign as fiduciaries of the Plans if as a result of their employment by

Citigroup they could not loyally serve the Plans and their participants. In addition, these

Defendants breached their fiduciary duties when they failed to prohibit any participant from

making an "investment switch" into Citigroup stock. In fact, the Defendants continued to invest

and to allow investment of the Plans' assets in Company stock even though they knew or should

have known that Citigroup would be taking billions of dollars in losses to remedy its risky

exposure to the subprime credit market, resulting in a decrease in the value of Citigroup stock.

No other Defendant fiduciary took any action to remedy the breaches set forth in this paragraph.

      161.    The Defendants breached their fiduciary duties by direct and indirect

communications with the Plans' participants, made in their fiduciary capacity, which contained

statements concerning Company stock that these Defendants knew or should have known were

untrue and inaccurate. These communications included Class-wide and Plan-wide affirmative

and materially misleading statements as to Citigroup's investment practices, Citigroup's

earnings, and Citigroup's profitability as detailed in this Complaint, that were contained in the

following documents that, upon information and belief, were specifically incorporated into the

SPD: SEC S-8 statements, SEC Form 10-K annual reports and interim periodic reports,

Citigroup's Annual Report, and the Plan's annual report on SEC Forms 11-K. In addition, the

foregoing documents omitted, and continue to omit, material information concerning Citigroup's

financial performance, including Citigroup's risky exposure to the subprime credit market. No Defendant took any action to remedy the breaches set forth in this paragraph.

162.    Moreover, Defendants knew or recklessly disregarded certain basic facts about the characteristics and behavior of the Plans' participants, well-recognized in the 401(k) and ESOP industry and trade press:

      (a)    Out of loyalty, employees tend to invest in company stock;

      (b)    Employees tend not to change their investment option allocations in the plan once made;

      (c)    Lower income employees tend to invest more heavily in company stock than more affluent workers, though they are at greater risk; and

      (d)    Many employees do not recognize their exposure to massive loss from failing to diversify their investment.

163.    As a result of Defendants' knowledge of and implication in creating and maintaining public misconceptions concerning the true financial health of the Company, any warnings of market and diversification risks that Defendants made to the Plans' participants regarding the Plans' investment in Citigroup stock did not effectively inform the Plans' participants of the past, immediate, and future dangers of investing in Company stock.

164.    Based on their actual or constructive knowledge as set forth in ¶¶ 123-152, Defendants knew about Citigroup's exposure to the subprime credit market. Defendants knew or should have known of the affirmative misrepresentations made to Participants in the SEC documents and annual reports incorporated into the SPDs. Defendants knew that the Plans' participants lacked the knowledge that Defendants had or should have had concerning the unsound business practices and knew or should have known that the Plans' participants would be

harmed by this lack of knowledge. Defendants on a Plan-wide and Class-wide basis, never accurately disclosed to Plaintiff or the Plans' participants the true nature, extent, and risks of these problems. Rather, Defendants failed to timely communicate accurate information to the Plans' participants concerning Citigroup's true financial condition, including its unsound business practices in prior periods, when they knew or should have known that the Plans' participants needed this information. Defendants and/or their individual fiduciary delegates, on a Class-wide and Plan-wide basis, failed to provide the Plans' participants with complete and accurate information regarding Citigroup stock, such that the participants could appreciate the true risks presented by investments in Citigroup stock and could make informed decisions thereby avoiding the unreasonable and entirely predictable losses incurred as a result of the Plans' investment in Citigroup stock. No Defendant took any action to remedy the breaches set forth in this paragraph.

165.    The Citigroup Defendants and Board Defendants failed in their fiduciary responsibilities in monitoring the Committee Defendants. The Citigroup Defendants and Board Defendants breached their fiduciary duties because they did not have procedures in place so that they could review and evaluate on an ongoing basis whether the Committee Defendants were performing their duties adequately and in accordance with ERISA's fiduciary provisions. The Citigroup Defendants and Board Defendants breached their fiduciary duty to remove the Committee Defendants when they knew the Committee Defendants had breached their fiduciary duties. The Citigroup Defendants and Board Defendants failed to adequately review the performance of the Committee Defendants to: ensure that they were fulfilling their fiduciary duties under the Plans and ERISA; ensure that they had adequate information to do their job of

overseeing the Plans' investments; ensure that they adequate access to and use of impartial advisors when needed; and ensure that they reported regularly to the Board.

## DEFENDANTS SUFFERED FROM CONFLICTS OF INTEREST

166.    Citigroup's SEC filings make clear that a significant percentage of Citigroup's officer and director compensation is in the form of stock grants or stock option grants.

167.    Because the compensation of many of the Defendants was significantly tied to the price of Citigroup stock, Defendants had an incentive to keep the Plans' assets heavily invested in Citigroup stock on a regular, ongoing basis. Elimination of Company stock as an investment option would have reduced the overall market demand for Citigroup stock and sent a negative signal to Wall Street analysts, which would have adversely affected the price of Citigroup stock, resulting in lower compensation for the Defendants.

168.    Moreover, keeping the Plans' assets heavily invested in Citigroup stock allowed Defendants to sell their personally held Citigroup stock at artificially inflated prices.

169.    This insider selling created a serious conflict of interest between Defendants' fiduciary duties and their personal interests, because Defendants were able to divest their own Company stock when they became aware of the Company's risky exposure to the subprime credit market; they did **not**, however, divest the Plans' investment in Citigroup stock, allowing themselves to personally profit and leaving the Plans to suffer massive losses.

170.    Some Defendants may have had no choice in tying their compensation to Citigroup stock (because compensation decisions were out of their hands), but Defendants did have the choice in what information to disclose to the Participants and whether to keep the Participants' retirement savings invested in Company stock.

171.    These conflicts of interest put the Defendants in the position of having to choose between their own interests and the interests of the Participants.

## CAUSATION

172.    The Plans suffered massive losses because a substantial amount of the Plans' assets were imprudently invested by the Plans in Citigroup stock during the Class Period, and in breach of Defendants' fiduciary duties.

173.    Had Defendants properly discharged their fiduciary duties, including the provision of full and accurate disclosure of material facts concerning Citigroup stock and divesting the Plans from Company stock offered by the Plans when such investment became imprudent, the Plans would have avoided losses suffered in Company stock.

174.    As a result of Defendants' actions, Plaintiffs and the Class, which invested in Citigroup stock through the Plans, were wrongfully damaged, as the Plans suffered substantial losses from Defendants' failure to fulfill their fiduciary responsibilities as described herein. Had the fiduciaries acted prudently and in accordance with their fiduciary duties, they would have taken steps to eliminate or reduce the amount of Citigroup stock held by the Plans, eliminated the option for participants to place funds in Citigroup stock, or fully disclosed the material adverse facts concerning Citigroup stock described herein. Plaintiffs and the Class are entitled to the best alternative investment available to them under the circumstances, and the Plans would have achieved gains and avoided losses but for Defendants' breach of fiduciary duty as described herein.

175.    The Plans and the Plans' fiduciaries do not qualify for any affirmative defense based on ERISA Section 404(c) as the Plans did not satisfy the numerous stringent requirements of Section 404(c) and the Department of Labor Regulations promulgated thereunder, as set forth in 29 C.F.R. § 2550.404c-1. This is because Defendants, among other ERISA § 404(c) disclosure failures, failed to ensure effective participant control by providing complete and accurate material information to participants regarding Company stock. *See* 29 C.F.R. §

48

2550.404c-1(b)(2)(i)(B) (the participant must be provided with "sufficient information to make informed decisions"). As a consequence, participants in the Plans did not have informed control over the portion of the Plans' assets that were invested in Company stock as a result of their investment directions, and the Defendants remained entirely responsible for losses that result from such investment.

176.    Furthermore, under ERISA, fiduciaries - not participants - exercise control over the selection of investment options made available to participants. Thus, whether or not participants are provided with the ability to select among different investment options, and whether or not participants exercised effective control over their investment decisions (which was not the case here), liability attaches to the fiduciaries if an imprudent investment option is selected by the fiduciaries and presented as an option to participants, and as a result of such action the Plans suffer a loss. Because this is precisely what occurred in this case, Defendants are liable for the losses incurred by the Plans and are not entitled to any protection under ERISA § 404(c).

177.    The losses suffered by the Plans and the Plans' participants and beneficiaries, including Plaintiffs and the Class, were the direct and necessary result of the misconduct of Defendants alleged herein. Plaintiffs and the Class were unaware, and in the exercise of reasonable diligence could not have been aware, of the true and accurate extent of Citigroup's risky and unsound business practices, as well as Defendants' continuing breaches of fiduciary duty in failing to disclose such material facts.

### REMEDIES FOR DEFENDANTS' BREACH OF THEIR FIDUCIARY DUTIES

178.    Defendants breached their fiduciary duties in that they knew or recklessly disregarded the facts as alleged above, and therefore knew or recklessly disregarded that the

49

Plans' assets should not have been so heavily invested in Company stock. As a consequence of the Defendants' breaches, the Plans suffered significant losses.

179.    ERISA § 502(a)(2), 29 U.S.C. § 1132(a)(2) authorizes a plan participant to bring a civil action for appropriate relief under ERISA § 409, 29 U.S.C. § 1109. Section 409 requires "any person who is a fiduciary . . . who breaches any of the . . . duties imposed upon fiduciaries . . . . to make good to such plan any losses to the plan." Section 409 also authorizes "such other equitable or remedial relief as the court may deem appropriate."

180.    With respect to calculation of the losses to a plan, breaches of fiduciary duty result in a presumption that, but for the breaches of fiduciary duty, the participants and beneficiaries in the plan would not have made or maintained its investments in the challenged investment and, where alternative investments were available, that the investments made or maintained in the challenged investment would have instead been made in the most profitable alternative investment available. In this way, the remedy restores the values of the Plans' assets to what they would have been if the plan had been properly administered.

181.    Plaintiff and the Class are therefore entitled to relief from the Defendants in the form of: (1) a monetary payment to the Plans in the amount of the losses to the Plans resulting from the breaches of fiduciary duties alleged above and to be proven at trial based on the principles described above, as provided by ERISA § 409(a), 29 U.S.C. § 1109(a); (2) injunctive and other appropriate equitable relief to remedy the breaches alleged above, as provided by ERISA § 409(a) and 502(a)(2)-(3), 29 U.S.C. § 1109(a) and § 1132(a)(2)-(3); (3) reasonable attorneys' fees and expenses, as provided by ERISA § 502(g), 29 U.S.C. § 1132(g), the common fund doctrine, and other applicable law; (4) taxable costs; (5) interests on these amounts, as provided by law; and (6) such other legal or equitable relief as may be just and proper.

## Count I

### Failure to Prudently Manage the Plans' Assets;
### Breach of Fiduciary Duties In Violation of ERISA § 404
### (Against All Defendants )

182.    Plaintiff incorporates the foregoing paragraphs herein by reference.

183.    The Plans are governed by the provisions of ERISA, 29 U.S.C. § 1001, et. seq.,

and Plaintiffs and the Class are participants and/or beneficiaries in the Plans. The Defendants are

all fiduciaries with respect to the Plan within the meaning of ERISA § 3(21)(A), 29 U.S.C. §

1002(21)(A). They were thereby bound by the duties of loyalty, exclusive purpose, and

prudence.

184.    Defendants named in this Count were each responsible, in different ways and

degrees, for the Plans' investments in Company stock.

185.    Under ERISA, fiduciaries who exercise discretionary authority or control over the

management of a plan or disposition of a plan's assets are responsible for ensuring that

investment options made available to plan participants are prudent. Furthermore, such

fiduciaries are responsible for ensuring that assets within the plan are prudently invested.

186.    The fiduciary duty of loyalty likewise entails a duty to avoid conflicts of interest

and to resolve them promptly when they occur. A fiduciary must always administer a plan with

single-minded devotion to the interests of the participants and beneficiaries, regardless of the

interests of the fiduciaries themselves or the plan sponsor.

187.    Defendants named in this Count were responsible for ensuring that investment in

Company stock was prudent and consistent with the purpose of the Plans. Defendants are liable

for any and all losses incurred as a result of such investments being imprudent.

51

188.   During the Class Period, the Defendants named in this Count knew or should have

known that Company stock was not a suitable, prudent or appropriate investment for the Plans as

described herein irrespective of any duty of diversification that may exist. Notwithstanding this

knowledge, these Defendants offered and continued to offer Company stock as investment

options for the Plans and/or offered and continued to offer to direct and approve the investment

in Company stock.

189.   Moreover, during the Class Period, despite their knowledge of the imprudence of

the investment, the Defendants named in this Count failed to take any meaningful steps to

prevent the Plans, and indirectly the Plans' participants and beneficiaries, from suffering losses

as a result of the Plans' investments in Company stock. The Defendants named in this Count

knew or should have known that a prudent fiduciary acting under similar circumstances would

have made different investment decisions with respect to the Company stock and that continued

investment in Company stock was not in keeping with the Plans' settlors' expectation on how a

prudent fiduciary would operate.

190.   The Defendants named in this Count had actual or constructive knowledge of the

Company's serious mismanagement, risky lending practices and other misrepresentations that

impacted Company stock as alleged in this Complaint. Despite this knowledge, they participated

in each other's failures to prudently manage the Plans' assets and knowingly concealed such

failures by not informing the Plans' participants that Company stock was not a prudent

investment.

191.   In addition to other breaches of fiduciary duty alleged in this Count, the

Defendants committed the following fiduciary breaches: (a) failed to conduct an appropriate

investigation into whether Company stock was a prudent investment for the Plans; (b) failed to

develop appropriate investment guidelines for Company stock; (c) failed to divest the Plans of Company stock; (d) failed to discontinue further Plan contributions to Company stock; (e) failed to remove Company stock as investment options of the Plans; (f) failed to both consult or appoint independent fiduciaries regarding the appropriateness of an investment in Company stock; (g) failed to notify appropriate federal agencies, including the Department of Labor, of the facts and circumstances that made Company stock an unsuitable and imprudent investment for the Plans; and (h) failed to resign as fiduciaries of the Plans if, as a result of their employment by Citigroup or its affiliates, they could not loyally serve the Plans and their participants. In addition, these Defendants, breached their fiduciary duty when they failed to prohibit any participant in the Plans from making an "investment switch" into Company stock.

192.    As a result of the breach of fiduciary duties of the Defendants named in this Count, the Plans, and indirectly Plaintiffs and the Plans' other participants and beneficiaries, suffered damages, the exact amount of which will be determined at trial.

193.    Pursuant to ERISA § 502(a)(2), 29 U.S.C. § 1132(a)(2) and ERISA § 409, 29 U.S.C. § 1109(a), Defendants named in this Count are personally liable to restore the losses to the Plans caused by their breach of fiduciary duty as alleged in this Count.

### Count II

### Failure to Provide Complete and Accurate Information to Participants and Beneficiaries; Breaches of Fiduciary Duties in Violation of ERISA § 404 (Against All Defendants)

194.    Plaintiff incorporates the foregoing paragraphs herein by reference.

195.    At all relevant times herein, Defendants were fiduciaries within the meaning of ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A).

196.    During the Class Period, Defendants knew or should have known that Company stock was not a suitable, prudent or appropriate investment for the Plans.

197.    As alleged herein, the scope of the Defendants' fiduciary duties and responsibilities included drafting and disseminating Plan documents, SPDs and information to participants regarding the assets of the Plans.

198.    All Defendants had a duty to provide participants with information they possessed that they knew or should have known would have a material impact on the Plans.

199.    The duty of loyalty under ERISA requires the Defendants to speak truthfully to Plans' participants, not to mislead them regarding the Plans or the Plans' assets, and to disclose information that participants need in order to exercise their rights and interests under the Plans. The Defendants' duty of loyalty included not only the negative duty not to misinform, but also an affirmative duty to inform when the Defendants' knew or should have known that silence might be harmful. If a fiduciary knows that a material misrepresentation has been made to a Participant, that fiduciary, without regard to the functions which make that person a fiduciary, has an affirmative duty to correct that misrepresentation. Moreover, Defendants are required to provide each participant with sufficient information to make informed decisions with regard to investment alternatives available under the Plans, including Company stock.

200.    The fiduciary duty of loyalty likewise entails a duty to avoid conflicts of interest and to resolve them promptly when they occur. A fiduciary must always administer a plan with single-minded devotion to the interests of the participants and beneficiaries, regardless of the interests of the fiduciaries themselves or the plan sponsor.

201.    This duty to inform participants included the Defendants' obligation to provide participants and beneficiaries of the Plans with complete and accurate information, and to refrain

54

from providing false information or concealing material information regarding the Plans' investment options such that participants can make informed decisions with regard to investment options available under the Plans. This duty applies to all of the Plans' investment options, including the Company stock.

202.    Because a substantial percentage of the Plans' assets were invested in Company stock, such investment carried with it an inherently high degree of risk. This inherent risk made the Defendants' duty to provide complete and accurate information particularly important with respect to Company stock.

203.    Because of the disparity in knowledge between Defendants and the Plans' participants, the participants relied on Defendants to provide them with accurate and complete information about Citigroup, which was material to the suitability of Company stock as a prudent investment option.

204.    The fiduciary duty to honestly communicate with participants is designed not merely to inform participants and beneficiaries of conduct, including illegal conduct, bearing on their retirement savings, but also to forestall such illegal conduct in the first instance. By failing to discharge their disclosure duties, the Defendants facilitated the illegal conduct in the first instance.

205.    The Defendants breached their fiduciary duties by direct and indirect communications with the Plans' participants, made in their fiduciary capacity, which contained statements concerning Company stock that these Defendants knew or should have known were untrue and inaccurate. These communications included Class-wide and Plan-wide affirmative and materially misleading statements as to Citigroup's risky exposure to the subprime credit market as detailed in this Complaint.

206.    The Defendants breached their fiduciary duties not only with regard to the affirmative misrepresentations, but also because those documents omitted, and continue to omit, material information concerning Citigroup's serious mismanagement, including Citigroup's risky exposure to the subprime credit market. In addition, the Defendants breached their fiduciary duties by conveying inaccurate information regarding the soundness or security of Company stock and the prudence of investing retirement contributions in Company stock.

207.    All Defendants breached their fiduciary duty when they failed to provide Plan participants, on a Class-wide and Plan-wide basis, information regarding the imprudence of investing in Company stock. All Defendants knew or should have known that Plan participants lacked the knowledge that Defendants possessed concerning the imprudence of investing in Company stock; knew or should have known that the Plans' participants would be harmed by this lack of knowledge; and knew or should have known that material misrepresentations regarding Company stock were made to Plan participants. All Defendants, on a Plan-wide and Class-wide basis, never accurately disclosed to Plaintiffs or the Plans' participants the true nature, extent, and risks of investing in Company stock when they knew or should have know that investment in Company stock was imprudent. Rather, all Defendants failed to timely communicate accurate information to Plan participants concerning Citigroup's risky exposure to the subprime credit market during the Class Period when they knew or should have known that Plans' participants needed this information.

208.    As a consequence of Defendants' breaches of fiduciary duty alleged in this Count, the Plans suffered tremendous losses. If the Defendants had discharged their disclosure obligations prudently and in the sole interests of Plan participants and beneficiaries, then losses suffered by the Plan would have been avoided or greatly minimized. Therefore, as a direct and

proximate result of the breaches of fiduciary duties alleged herein, the Plans, and indirectly

Plaintiffs and the other Class members, lost hundreds of millions of dollars of retirement savings.

209.    Pursuant to ERISA § 502(a)(2), 29 U.S.C. § 1132(a)(2) and ERISA § 409, 29

U.S.C. § 1109(a), the Defendants are personally liable to the Plans for these losses incurred as a

result of Defendants' misrepresentations to the Plans' participants as well as their breach of the

fiduciary duty to disclose and inform.

### Count III

**Failure in Appointing and Monitoring Plan Fiduciaries;
Breaches of Fiduciary Duties in Violation of ERISA § 404
(Against the Board Defendants and the Citigroup Defendants)**

210.    Plaintiff incorporates the foregoing paragraphs herein by reference.

211.    At all relevant times herein, Defendants were fiduciaries within the meaning of

ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A).

212.    At all relevant times herein, the fiduciary duties of the Board Defendants and

Management Defendants included the power and responsibility to appoint, and the duty to

oversee and thereby monitor the performance of the Committee.

213.    At all relevant times herein, the scope of the fiduciary duties of the Board

Defendants and Citigroup Defendants included the oversight and the power and responsibility to

appoint, and thereby monitor the performance of the Committee.

214.    During the Class Period, Defendants knew or should have known that Company

stock was not a suitable, prudent or appropriate investment for the Plans, as described herein.

215.    Under ERISA, a fiduciary with appointment powers must ensure that the

appointed fiduciaries are performing their fiduciary obligations, including those obligations with

respect to handling, holding and investing plan assets; and must take prompt and effective action

to protect the plan and participants when the appointed fiduciaries are not meeting their fiduciary obligations.

216.    The appointing fiduciary must have procedures in place so that they may review and evaluate on an ongoing basis whether the appointed fiduciaries are doing an adequate job (including, for example, by requiring periodic reports on their work and the plan's performance, and by ensuring that they have a prudent process for obtaining information and resources they need). In the absence of a sensible process for monitoring their appointees, the appointing fiduciaries would have no basis for (1) promptly and prudently concluding that their appointees were faithfully and effectively performing their obligations to plan participants; or (2) deciding whether to retain or remove their appointees.

217.    An appointing fiduciary must provide the appointed fiduciaries with all the information that they have or reasonably should have in order to prudently manage the plan and the plan assets or that may have a material impact on the plan and the fiduciaries' investment decisions regarding the plan.

218.    The Board Defendants and Citigroup Defendants breached their fiduciary appointing and monitoring duties by, among other things: (1) failing to appoint persons with the requisite knowledge, skill, and expertise to properly administer the Plan and manage its assets; (2) failing to adequately monitor their appointees, evaluate their performance, or have an adequate system in place for doing so, (and standing idly by as the Plans suffered enormous losses as a result of the appointees' imprudent action); (4) failing to ensure that the appointed fiduciaries (although possessing actual knowledge of unsound business practices and risky lending activities and other misrepresentations concerning Company stock as alleged herein) understood the true extent of Citigroup's unsound business practices and risky lending activities

and its impact on the value of Company stock and the Plan's concomitant investment in Company stock.

219.    The Board Defendants and the Citigroup Defendants breached their fiduciary duty by failing to remove the appointed fiduciaries, as named herein, whose performance was inadequate. The Board Defendants, knew that the appointed fiduciaries: (a) failed to conduct an appropriate investigation into whether Company stock was a prudent investment for the Plans; (b) failed to develop appropriate investment guidelines for Company stock; (c) failed to divest the Plans of Company stock; (d) failed to discontinue further Plan contributions to Company stock; (e) failed to remove Company stock as investment options for the Plans; (f) failed to consult with or appoint independent fiduciaries regarding the appropriateness of an investment in Company stock; (g) failed to prohibit any participant from making an "investment switch" into Company stock; (h) failed to notify appropriate federal agencies, including the Department of Labor, of the facts and circumstances that made Company stock an unsuitable or imprudent investment for the Plans; and (i) failed to inform Plan participants that investment in Company stock would not be prudent.

220.    As a consequence of the Board Defendants' and the Citigroup Defendants' breaches of fiduciary duty, the Plans suffered tremendous losses. Had Defendants named in this Count discharged their fiduciary duties as described above, the losses suffered by the Plans would have been averted or, at a minimum, lessened. Therefore, as a direct and proximate result of the breaches of fiduciary and co-fiduciary duties alleged herein, the Plans, and indirectly Plaintiffs and the other Class members, lost hundreds of millions of dollars of retirement savings.

221.    As a direct and proximate result of the breaches of fiduciary duties alleged herein, the Plans, and indirectly Plaintiffs and the Plans' other participants and beneficiaries, suffered damages, the exact amount of which will be determined at trial.

222.    Pursuant to ERISA § 502(a)(2), 29 U.S.C. § 1132(a)(2) and ERISA § 409, 29 U.S.C. § 1109(a), the Board Defendants and Citigroup Defendants are personally liable to restore the losses to the Plans caused by their failure to monitor and remove fiduciaries as alleged in this Count.

### Count IV

#### Co-Fiduciary Liability;
#### Breaches of Fiduciary Duties in Violation of ERISA § 405
#### (Against all Defendants)

223.    Plaintiff incorporates the allegations contained in the previous paragraphs of this Complaint as if fully set forth herein.

224.    At all relevant times, Defendants were fiduciaries within the meaning of ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A).

225.    ERISA § 405(a), 29 U.S.C. § 1105, imposes liability on a fiduciary, in addition to any liability which he may have under any other provision, for a breach of fiduciary responsibility of another fiduciary with respect to the same plan if: (i) he participates in, or undertakes to conceal, an act or omission of such other fiduciary, knowing such act or omission is a breach; (ii) he fails to comply with ERISA § 404(a)(1), 29 U.S.C. § 1104(a)(1) in the administration of his specific responsibilities which give rise to his status as a fiduciary, by enabling such other fiduciary to commit a breach; or (iii) he knew or should have known of a breach by such other fiduciary, unless he makes reasonable efforts under the circumstances to remedy the breach.

226.    During the Class Period, Defendants knew that Company stock was not a suitable, prudent or appropriate investment for the Plans as described herein.

Failure to Remedy

227.    ERISA § 405(a)(3), 29 U.S.C. § 1105(3) imposes co-fiduciary liability on a fiduciary for a fiduciary breach by another fiduciary if, he has knowledge of a breach by such other fiduciary, unless he makes reasonable efforts under the circumstances to remedy the breach.

228.    The Board Defendants were aware that the Committee Defendants breached their fiduciary duties as alleged in Count I of the Complaint. Despite this knowledge, the Board Defendants failed to undertake any effort to remedy their co-fiduciaries' failures to prudently and loyally manage the Plans' investment in Company stock, as well as other fiduciary breaches alleged in Count I. Instead, they allowed the harm to continue and contributed to it throughout the Class Period in violation of ERISA § 405(a)(3). The actions which the Board Defendants could have taken, included but are not limited to: (1) objecting to the conduct of the other fiduciaries and insisting that their objections and any response to the objections be made part of the minutes of a meeting of the Board; (2) disclosing the imprudence of the investment in Company stock to the Plans' participants; (3) notifying the U.S. Department of Labor of their co-fiduciaries actions; or (4) preparing to obtain an injunction from a Federal District Court.

229.    To the extent that it is determined that any Board Defendant and/or Committee Defendant did not breach his fiduciary duty as alleged in Count I of the Complaint, that Defendant was still aware that the remaining Defendants in Count I did, in fact, breach their fiduciary duties. Despite this knowledge, the Defendant(s) named in this paragraph breached their fiduciary duties by failing to undertake any effort to remedy their co-fiduciaries' failures to prudently and loyally manage the Plan's investment in Company stock and other fiduciary

breaches alleged in Count I. Instead, they allowed the harm to continue and contributed to it throughout the Class Period in violation of ERISA § 405(a)(3). The actions that the Defendant(s) could have taken included but are not limited to: objecting to the conduct of the other fiduciaries and insisting that their objections and any response to the objections be made part of the minutes of a meeting of the Board or Committee; disclosing the imprudence of the investment in Company stock to Plan Participants; notifying the U.S. Department of Labor of their co-fiduciaries' conduct; or preparing to obtain an injunction from a Federal District Court.

230.    To the extent that it is determined that any Defendant did not commit any of the fiduciary breaches as alleged in Count II of the Complaint, any such Defendant was still aware that the remaining Defendants named in Count II breached their fiduciary duties. Despite this knowledge, these Defendants breached their fiduciary duty by failing to undertake any effort to remedy the fiduciary breaches alleged in Count II, including the duty to remedy their co-fiduciaries' misrepresentations and their co-fiduciaries' breach of the affirmative duty to inform Plan participants regarding the imprudence of investing in Company stock. Instead, they allowed the harm to continue and contributed to it throughout the Class Period in violation of ERISA § 405(a)(3). The actions which the Defendant(s) could have taken included but are not limited to: (1) objecting to the conduct of the other fiduciaries and insisting that their objections and any response to the objections be made part of the minutes of a meeting of the Board; (2) disclosing the imprudence of the investment in Company stock to Plan Participants; (3) notifying the U.S. Department of Labor of their co-fiduciaries' conduct; or (4) preparing to obtain an injunction from a Federal District Court.

Enabling A Breach

62

231.    ERISA § 405(a)(2), 29 U.S.C. § 1105(2) also imposes co-fiduciary liability on a fiduciary if by failing to comply with ERISA § 404(a)(1), 29 U.S.C. § 1104(a)(l), in the administration of his specific responsibilities that give rise to his status as a fiduciary, he has enabled another fiduciary to commit a breach.

232.    To the extent that it is determined that any Board Defendant or Committee Defendant lacked knowledge of the circumstances rendering the Plans' investment in Company stock imprudent, then all other Defendants enabled the imprudent asset management decisions of that Defendant by failing to provide that Defendant with complete and accurate information regarding the Company's risky exposure to the subprime credit market and other misrepresentations concerning Company stock. In failing to inform their co-fiduciaries, who lacked knowledge, if any, these Defendants breached ERISA § 405(a)(2).

233.    Through their failure to properly and effectively monitor their appointees, including the removal of those whose performance was inadequate as alleged in this Complaint, the Board Defendants enabled the Committee Defendants imprudent management of Company stock in the Plans.

234.    Further, through their failure to properly and effectively monitor their appointees, including the removal of those whose performance was inadequate as alleged above, the Board Defendants and Committee Defendants enabled the remaining Defendants imprudent management of Company stock in the Plans.

235.    The Board Defendants' failure to monitor the Committee Defendants enabled the Committee Defendants to breach their duties.

236.     As a direct and proximate result of the breaches of fiduciary duties alleged herein, the Plans, and indirectly Plaintiff and the Plans' other participants and beneficiaries, suffered damages, the exact amount of which will be determined at trial.

237.     Pursuant to ERISA § 502(a), 29 U.S.C. § 1132(a), ERISA § 409, 29 U.S.C. § 1109(a), and ERISA § 405, 29 U.S.C. § 1105, Defendants are liable to restore the losses to the Plans caused by their co-fiduciary breaches of fiduciary duties alleged in this Count.

## Count V

### Breach of Duty to Avoid Conflicts of Interest
### (Against All Individual Defendants)

238.     Plaintiff incorporates the foregoing paragraphs herein by reference.

239.     At all relevant times, as alleged above, the Individual Defendants were fiduciaries within the meaning of ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A).  Thus, they were bound by the duties of loyalty, exclusive purpose, and prudence.

240.     ERISA § 494(a)(1)(A), 29 U.S.C. § 1104(a)(1)(A) imposes on a plan fiduciary a duty of loyalty, that is, a duty to discharge his or her duties with respect to the plan solely in the interest of the participants and beneficiaries and for the exclusive purpose of providing benefits to participants and beneficiaries.

241.     These Defendants were heavily invested in Citigroup stock and had an interest in ensuring that the Plans' assets were also heavily invested in Citigroup stock on a regular, ongoing basis.  Elimination of Company stock as an investment option for the Plans would have reduced the overall market demand for Citigroup stock and sent a negative signal to Wall Street analysts, which would have adversely affected the price of Citigroup stock, resulting in losses for the Defendants named in this Count.

242. The Defendants named in this Count placed their own interest in investing the Plans' assets in Citigroup stock over the Plans' participants' interest in maintaining a diversified and prudently invested ERISA plan.

243. The Defendants named in this Count breached their duty to avoid conflicts of interest and to promptly resolve them by, inter alia: failing to engage an independent fiduciary who could make independent judgments concerning the Plans' investment in Citigroup stock; failing to take such other steps as were necessary to ensure that participants' interests were loyally and prudently served; and by failing to otherwise place the interests of the Plans' participants above the interests of themselves and the Company with respect to the Plans' investment in Citigroup stock.

244. As a result of these Defendants' breach of their duty to avoid conflicts of interest, the Plans, and indirectly Plaintiff and the Plans' other participants and beneficiaries suffered damages, the exact amount of which will be determined at trial.

245. Pursuant to ERISA § 502(a)(2), 29 U.S.C. § 1132(a)(2) and ERISA § 409, 29 U.S.C. § 1109(a), the Defendants named in this Count are personally liable to restore the losses to the Plans caused by their breach of the duty to avoid conflicts of interest as alleged in this Count.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays for judgment as follows:

A.  Determining that this is a proper class action to be certified under Rule 23 and appointing Plaintiff class representative on behalf of the Class; Declaring that Defendants, and each of them, are not entitled to protection under ERISA § 404(c)(1)(B), 29 U.S.C. § 1104(c)(1)(B);

B.  Declaring that Defendants have violated the duties, responsibilities, and obligations imposed upon them as fiduciaries and co-fiduciaries and that they violated the ERISA disclosure and monitoring requirements as described above;

C.   Compelling Defendants to make good to the Plans all losses to the Plans resulting from Defendants' breaches of their fiduciary duties, and to restore to the Plans all profits Defendants made through use of the Plans' assets, and to restore to the Plans all profits which the participants would have made had Defendants fulfilled their fiduciary obligations;

D.   Awarding actual damages in the amount of any losses the Plans suffered, to be allocated among the participants' individual accounts in proportion to the accounts' losses;

E.   Enjoining Defendants, and each of them, from any further violations of their ERISA fiduciary obligations;

F.   Requiring Defendants to appoint one or more independent fiduciaries to participate in the management of the Plans' investment in Citigroup stock;

G.   Awarding extraordinary, equitable, and/or injunctive relief as permitted by law, equity, and the federal statutory provisions set forth herein, pursuant to Fed. R. Civ. P. 64 and 65;

H.   Awarding the Plans and/or Plaintiff and members of the Class, restitution, disgorgement, and/or other remedial relief;

I.   Awarding the Plans and/or Plaintiff and members of the Class pre-judgment and post-judgment interest, as well as their reasonable attorneys' fees, expert witness fees, and other costs; and

J.   Awarding such other relief as this Court may deem just and proper.

Dated: December 11, 2007                    Respectfully submitted,

                                            **MILBERG WEISS LLP**

                                            Lori G. Feldman (LF-3478)
                                            Arvind B. Khurana (AK-3643)
                                            One Pennsylvania Plaza
                                            New York, New York 10119
                                            (212) 594-5300 (telephone)
                                            (212) 868-1229 (facsimile)
                                            lfeldman@milbergweiss.com
                                            akhurana@milbergweiss.com

                                            *Attorneys for Plaintiff*

## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| ALAN STEVENS, On Behalf of Himself and All Others Similarly Situated, | **Civil Action No.** |
| Plaintiff, | |
| v. | |
| CITIGROUP, INC., CITIBANK, N.A., CHARLES PRINCE, C. MICHAEL ARMSTRONG, ALAIN J.P. BELDA, GEORGE DAVID, KENNETH T. DERR, JOHN M. DEUTCH, PETER JOHNSON, ROBERTO HERNANDEZ RAMIREZ, ANDREW N. LIVERIS, ANNE MULCAHY, RICHARD D. PARSONS, JUDITH RODIN, ROBERT E. RUBIN, ROBERT L. RYAN, FRANKLIN A. THOMAS, THE PLANS ADMINISTRATION COMMITTEE OF CITIGROUP, INC., THE INVESTMENT COMMITTEE and JOHN DOES 1-30, | |
| Defendants. | |

## RELATED CASE AFFIDAVIT

STATE OF NEW YORK      )
                       ) ss:
COUNTY OF NEW YORK  )

LORI G. FELDMAN, being duly sworn, deposes and says:

1.    I am a partner at the law firm of Milberg Weiss LLP, attorneys for plaintiff in the

above-captioned action, which alleges claims under the Employee Retirement Income Security

Act of 1974 ("ERISA") §§ 405, 409, 502(a)(2), (3), 29 U.S.C. §§ 1105, 1109 and 1132(a)(2), (3).

2.    Upon information and belief, this action is related to the previously-filed action

captioned, <u>Gray v. Citigroup, Inc., et al.</u>, No. 1:07-cv-09790 (SHS), which also asserts similar

ERISA claims.

3.    Accordingly, it is respectfully submitted that this action should be assigned as a

related case to the Honorable Sidney H. Stein.

DATED: December 11, 2007

_____
Lori G. Feldman

**MILBERG WEISS LLP**
Lori G. Feldman (LF-3478)
One Pennsylvania Plaza
New York, NY 10119
Tel: (212) 594-5300
Fax: (212) 868-1229
lfeldman@milbergweiss.com

Sworn to before me this _11TH_
day of December 2007

_____
Notary Public

DAVID J. SCLAFANI
NOTARY PUBLIC, State of New York
No. 01SC6057709
Qualified in Kings County
Commission Expires April 23, _2011_